22-mj-7034-JCB
22-mj-7035-JCB
22-mj-7036-JCB
22-mj-7037-JCB
22-mj-7038-JCB
22-mj-7039-JCB
22-mj-7040-JCB

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Special Agent Jason Taylor, being sworn, state as follows:

### INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I was appointed to the FBI in May 2019. As such, I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code: that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code.

2.      I am currently assigned as a Special Agent to the FBI Metro Boston Gang Task Force ("MBGTF"). My duties include working as a liaison between federal, state, and local law enforcement entities in the investigation of illegal distribution of narcotics, firearm offenses, and associated gang-related violent crimes. In the course of participating in investigations of drug distribution/trafficking, I have conducted or participated in surveillance, the purchase of illegal drugs and firearms, the execution of search warrants, debriefings of subjects, witnesses, and informants and reviews of consensually recorded conversations and meetings.  Through my training, education, and experience, I have become familiar with the manner in which drug traffickers conduct their illegal drug trafficking activity, to include their use of cellular telephones to contact drug customers, drug runners, drug associates, and sources of illegal drug supply.  I am familiar with narcotics traffickers' methods of operation, including distribution, storage, and transportation of narcotics.

3.      Prior to my current assignment, I was assigned to the FBI Miami Field Office where I conducted investigations in Transnational Organized Crime Western Hemisphere, prior to the assignment in Miami I was a United States Army Infantry Officer where I conducted Counter Terrorism and Counterinsurgency Operations.

4.      Based on my training and experience as a Special Agent, I am familiar with federal narcotics laws. I know that it is a violation of Title 21 U.S.C. § 841(a)(1), for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

**PURPOSE OF THE AFFIDAVIT**

5.      I am currently investigating Csean SKERRITT  ("SKERRITT"), a/k/a "SHIZZ GRIMMY," a/k/a "BLACK," born 1988, and others yet unknown for violations of federal law, including Title 21, United States Code, Section 841(a)(1) (distribution of controlled substances) (the "TARGET OFFENSE").

6.      This affidavit is being submitted in support of applications for warrants to search:

a.      662 Columbia Road, Boston, MA 02125 (the "TARGET LOCATION - 1");

b.      A 2019 black Infiniti SUV with Massachusetts registration 3EKA91, registered to, and driven by, SKERRITT (the "TARGET VEHICLE - 1");

c.      A gray Nissan Altima with California registration 9BZH119, registered to UMI ASSET LLC, and driven by SKERRITT (the "TARGET VEHICLE - 2");

d.      The person of Csean SKERRITT;

e.      The cellular phone assigned telephone number 774-464-1682 ("TARGET PHONE - 1");

f.      The cellular phone assigned telephone number 857-383-8962 ("TARGET PHONE – 2"); and

2

g.      The cellular phone assigned telephone number 857-588-3057 ("TARGET PHONE - 3").

7.      Based on an investigation conducted by Special Agents[1] of the FBI, there is probable cause to believe that SKERRITT has violated the TARGET OFFENSE.   There is also probable cause to believe that these items and locations above, as described in Attachments A-1, A-2, A-3, A-4, A-5, A-6, and A-7, contain evidence, fruits, and instrumentalities of the TARGET OFFENSE, as described in Attachment B.

8.      There is also probable cause to believe that SKERRITT used the TARGET PHONES to participate in and facilitate the TARGET OFFENSES. Accordingly, there is probable cause to believe that the TARGET PHONES, which are further described in Attachments A-2, A-3, and A-4, contain evidence, fruits, and instrumentalities of the TARGET OFFENSES.

9.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested search warrants and does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

**I.      Background**

10.      The Federal Bureau of Investigation ("FBI") and the Boston Police Department ("BPD") are investigating SKERRITT, who I believe is an associate of the Morse Street gang in Boston. SKERRITT is selling fentanyl in the Boston area, since at least December, 2022.  Under

---

[1] Special Agents, Task Force Officers, and Boston Police Department ("BPD") Officers working with the FBI are hereafter referred to interchangeably as "Agents" or "Law Enforcement Officers."

the FBI's direction, an FBI cooperating witness ("CW-1") [2] made several controlled buys of narcotics from SKERRITT, which were audio and video recorded.

11.     I am aware that SKERRITT is associated with the Morse Street gang in the Dorchester area of Boston, Massachusetts. The Morse Street gang is a criminal organization that conducts illegal activity including, but not limited to: drug dealing, armed robbery, crimes of violence, and illegal firearm possession/use. Morse Street gang members have several hangout locations and residential addresses in the Dorchester area; however members also travel throughout the Greater Boston area to conduct their illegal activity.

12.     I am also aware, based in part on records checks of the Massachusetts Board of Probation ("BOP") and Interstate Identification Index ("III"), that SKERRITT has numerous prior entries on his criminal history, including both arrests and convictions for trafficking cocaine, murder, possession of a firearm without a permit, subsequent offense, carrying a dangerous weapon, assault and battery on a public employee, disturbance in a correctional institution and escape.  Amongst SKERRITT's convictions are multiple charges for which the possible sentence would (and did) exceed one year.  Namely, in or about 2014, SKERRITT received a sentence of 5 years to 5 years and 1 day in state prison for possession of a firearm without a permit, subsequent offense, in the Suffolk Superior District Court on docket 1484cr10456.

---

[2]  CW-1 has a criminal history that includes prior arrests for assault and battery with a dangerous weapon, breaking and entering, and distribution of Class A. On previous occasions, CW-1 has accurately identified, and corroborated events and individuals involved in active criminal investigations, including drug and firearm investigations.  CW-1's information has led to previous search warrants, arrests, convictions, and seizures related to drugs and firearms. At the direction of law enforcement, the CW-1 has conducted controlled purchases of evidence in conjunction with criminal investigations.  CW-1's cooperation is financially motivated and CW-1 is being paid for his/her services and information provided.  Based on the corroboration, including recordings, I believe that CW-1's information is reliable.

13.     SKERRITT originally used the telephone number ending in -1682 (the "TARGET PHONE – 1") when communicating with CW-1.  Leading up to a controlled purchase of fentanyl on February 1, 2023, SKERRITT text messaged CW-1 from the phone number ending in -8962 (the "TARGET PHONE – 2") and informed CW-1 that he lost his phone and that his new number was a telephone number ending in -3057 (the "TARGET PHONE - 3").  SKERRITT used the TARGET PHONE – 3 when communicating with CW-1 on the day of the controlled purchase of fentanyl on February 1, 2023.

14.     Your affiant queried the TARGET PHONE - 1 through law enforcement databases and learned that the TARGET PHONE - 1's service provider is T-Mobile. Your affiant also learned that the listed subscriber for the TARGET PHONE 1 is "Csean SKERRITT" at a listed address in Boston, MA, that it was activated on or about September 21, 2021, and is believed to be used by SKERRITT.

15.     Your affiant queried TARGET PHONE - 2 through law enforcement databases and I have not been able to locate subscriber information.  I believe that TARGET PHONE – 2 is possibly a prepaid phone.  Based on my training and experience, the use of a prepaid phone, also known as a "burner" phone, is a common tactic of drug traffickers to elude identification by law enforcement and further one's conducting of unlawful activity.

16.     Your affiant queried the TARGET PHONE - 3 through law enforcement databases and learned that the TARGET PHONE - 3's service provider is T-Mobile. Your affiant also learned that the listed subscriber for the TARGET PHONE -3 is "Csean SKERRITT" at a listed address in Boston, MA, that it was activated on or about January 29, 2023, and is believed to be used by SKERRITT.

17.     For each of the controlled buys described below, law enforcement followed the following procedures: law enforcement officers first searched CW-I and his/her vehicle for money and contraband, with negative results.  Officers then provided to CW-I Official Agency Funds ("OAF") and a recording device and transmitter for use in the purchase. Officers then directed CW-1 to make a controlled purchase of drugs and conducted surveillance while CW-I drove to a prearranged location to meet SKERRITT, throughout the transaction, and as CW-1 drove back to a prearranged meet location to meet with officers.  There, officers retrieved the narcotics and recording and again searched CW-1 and his/her vehicle for contraband and money, with negative results.

## II.     Controlled Purchases from SKERRITT

18.     On January 25, 2023, CW-1 communicated with SKERRITT, who CW-1 knows by his nickname, "BLACK," through a series of phone calls, during which SKERRITT agreed to sell 5 "fingers," meaning 50 grams of fentanyl, for $1,500 to CW-1.  During these initial communications, they agreed to meet at 35 Pembroke Street in Chelsea, MA.

19.     During these communications with CW-1, SKERRITT used the telephone number 774-464-1682 ("TARGET PHONE - 1") for phone calls and text messages. One of these text messages from SKERRITT directed CW-1 to meet at 35 Pembroke Street.  Additional text messages between CW-1 and the TARGET PHONE – 1 confirmed the meeting time and location for the controlled purchase on that date.  Law enforcement officers involved in this investigation and CW-1 have become familiar with SKERRITT's voice and have recognized it on phone calls on both TARGET PHONE 1 and subsequently on TARGET PHONE 3.  Following the series of communications between SKERRITT and CW-1, law enforcement officers followed the procedures described above, provided CW-1 with $1,500 and instructed CW-1 to meet with

SKERRITT and make the drug purchase.  Law enforcement officers subsequently surveilled CW-1 to the pre-arranged meeting location at 35 Pembroke Street in Chelsea, MA, where CW-1 parked.

20.     At around the same time, additional law enforcement officers were conducting surveillance at pre-arranged meeting location at 35 Pembroke Street and observed SKERRITT, who was wearing a face covering [3], arrive at 35 Pembroke Street in a 2019 black Infiniti SUV with Massachusetts registration 3EKA91 [4] (the "TARGET VEHICLE - 1"), where he parked TARGET VEHICLE – 1, exited the vehicle and entered CW-1's vehicle.

21.     This meeting location, 35 Pembroke Street, is approximately 200 feet away from SKERRITT's residence, located at 21 Beacon Street, Chelsea, MA.  I am aware 21 Beacon Street is SKERRITT' residential address based in part on my involvement in this investigation and based on records checks.  While reviewing records, including from Door Dash, an online food ordering and delivery platform, I have learned that SKERRIT provided 21 Beacon Street, Chelsea, MA for his residence on his account.

22.     Agents, while monitoring the controlled purchase via physical surveillance and the transmitter, observed the following: SKERRITT entered the front passenger seat of CW-1's vehicle and engaged in a brief conversation with CW-1, during which SKERRITT and CW-1 conducted an exchange. After the exchange, SKERRITT walked directly from CW-1's vehicle back to the TARGET VEHICLE – 1 and left the area, driving in the direction of Beacon Street. CW-1 then also left the area.

---

[3] During this controlled purchase, law enforcement officers observed SKERRITT wearing the face covering, a black facemask, along with a winter jacket with a fur-lined hood, a light-colored hooded sweatshirt, distressed (cut-up) jeans, and white athletic shoes.

[4] I am aware, based in part on records checks of the Massachusetts Registry of Motor Vehicles ("RMV"), that this vehicle is registered to SKERRITT.

23.     After CW-1 left the vicinity of TARGET LOCATION – 1, law enforcement officers surveilled CW-1 to a predetermined location and CW-1 provided law enforcement officers with a clear bag containing a white powdery substance.  Law enforcement officers then searched CW-1 and his/her vehicle again, with negative results.  During the debriefing, CW-1 told agents that CW-1 met with SKERRITT, where he/she purchased the suspected narcotics in exchange for the OAF.

24.     The clear bag contained approximately 54.6 grams of a white powdery substance that field-tested positive for the presumptive presence of fentanyl. Based on my training and experience, as well as that of other agents familiar with this investigation, the white powdery substance appeared to be fentanyl. Additionally, I believe this based on various factors, including the information learned during the course of this investigation and the packaging, size, shape & color of the substance.

25.     On February 1, 2023, CW-1 communicated with SKERRITT through a series of phone calls and text messages, during which SKERRITT agreed to sell 5 additional "fingers," meaning 50 grams of fentanyl, for $1,500 to CW-1.  During these initial communications, they agreed to meet at 662 Columbia Road in Boston, MA (the "TARGET LOCATION – 1"). [5] Shortly thereafter, SKERRITT instructed CW-1 to meet at a different location in Boston, approximately 0.1 miles away from TARGET LOCATION – 1.

_____

[5] I am aware that TARGET LOCATION – 1 belonged to Laelea Janiera Skerritt, because she is listed in the Boston City Assessing Department as the homeowner of 662 Columbia Road.  In addition, Laelea Skerritt's RMV record lists 662 Columbia Road in Boston, MA as her address. I previously believed that she was SKERRITT's mother (and, in fact, I swore out an affidavit earlier today, identifying her as SKERRITT's mother).  However, according to an online obituary, Lealea Skerritt unfortunately passed away in 2020, and was the sister of Alexander Skerritt.  *See* https://www.lopesfuneralhome.com/obituary/Laelea-Skerritt . According to SKERRITT's BOP, his father is Alexander Skerritt and SKERRITT's middle name is Alexander.  Additionally, according to SKERRITT's BOP, his mother is Mary and I no longer believe that SKERRITT's mother is Laelea. However, I do believe that SKERRITT has a connection to this location, through his family, although I don't currently know who legally owns TARGET LOCATION - 1 at this point.

26.     As referenced above, leading up to a controlled purchase of fentanyl on February 1, 2023, SKERRITT text messaged CW-1 from the telephone number 857-383-8962 ("TARGET PHONE – 2") and informed CW-1 that he lost his phone and that his new number was telephone number 857-588-3057 (the "TARGET PHONE - 3").  After that, SKERRITT, using the TARGET PHONE – 3, continued to communicate with CW-1.  For example, on February 1, 2023, SKERRITT directed CW-1 to meet at the TARGET LOCATION - 1.  In subsequent text messages, SKERRITT asked CW-1 to meet at the KFC restaurant located at 695 Columbia Road and that SKERRITT was making another "play" and running late. I know, based on my training and experience, that a "play" is a slang term for making an illicit narcotics transaction. Shortly before SKERRITT met with CW-1, at approximately 12:13pm, he sent an additional text using TARGET PHONE – 3, stating that "I'm not going to be long, there is no traffic, just pulled up, I'm grabbing it." Based on my involvement in this investigation, I believe that "it" is a reference to the fentanyl that SKERRITT would subsequently sell CW-1 on February 1, 2023.

27.     Following the series of communications between SKERRITT and CW-1, law enforcement officers followed the procedures described above, provided CW-1 with $1,500 and instructed CW-1 to meet with SKERRITT and make the drug purchase.  Law enforcement officers subsequently surveilled CW-1 to the pre-arranged meeting location in the vicinity of TARGET LOCATION – 1 in Boston, MA.

28.     While law enforcement officers surveilled CW-1 to the pre-arranged meeting location, additional law enforcement officers were conducting surveillance at the TARGET LOCATION – 1 in Boston, MA and at approximately 12:14pm [6], officers observed SKERRITT,

---

[6] The FBI 302 report from this incident states this observation is at approximately "12:24pm," that is an error, the actual time of the observation is approximately 12:14pm.  In fact, this notation comes between observations made at 12:13pm and 12:21pm.

who was wearing a face covering [7], arrive at the TARGET LOCATION – 1 in a gray Nissan

Altima, with California registration 9BZH119 [8] (the "TARGET VEHICLE - 2").  Investigators,

including myself, are familiar with SKERRITT's appearance based on surveillance during the

investigation, his RMV photo, and prior interactions with involved officers from BPD.

SKERRITT used a key to unlock the door and enter that residence.  A few minutes later,

SKERRITT exited the residence and drove the TARGET VEHICLE - 2 directly to the pre-

arranged meeting location at the KFC restaurant located at 695 Columbia Road in Boston, MA,

where he met with CW-1 at approximately 12:21 pm.

29.     Agents, while monitoring the controlled purchase via physical surveillance and

the transmitter, observed the following: SKERRITT entered the front passenger seat of CW-1's

vehicle and engaged in a brief conversation with CW-1, during which SKERRITT and CW-1

conducted an exchange. After the exchange, SKERRITT walked directly from CW-1's vehicle

back to the TARGET VEHICLE – 2 and left the area.  CW-1 then also left the area.

30.     After CW-1 left the vicinity of TARGET LOCATION – 1, law enforcement

officers surveilled CW-1 to a predetermined location and retrieved from CW-1 the recorder and

transmitter and a clear bag containing a white powdery substance.  Law enforcement officers

then searched CW-1 and his/her vehicle again, with negative results.  During the debriefing,

CW-1 told agents that CW-1 met with SKERRITT where he/she purchased the suspected

narcotics in exchange for the OAF.

---

[7] During this controlled purchase, law enforcement officers observed SKERRITT wearing the face covering, a black facemask, along with a black leather jacket, black jeans, and white athletic sneakers.

[8] I am aware that this vehicle is registered to UMI ASSET LLC in San Francisco, California. I believe, based on my involvement in this investigation, that this vehicle is possibly a rental car.

31.     The clear bag contained approximately 55.0 grams of a white powdery substance

that field-tested positive for the presumptive presence of fentanyl. Based on my training and

experience, as well as that of other agents familiar with this investigation, the white powdery

substance appeared to be fentanyl. Additionally, I believe this based on various factors, including

the information learned during the course of this investigation and the packaging, size, shape &

color of the substance.

## III.   PROBABLY CAUSE THAT THE TARGET LOCATION AND TARGET VEHICLES CONTAIN FRUITS, EVIDENCE AND INSTRUMENTALITIES OF THE TARGET OFFENSE

32.     Based on the above controlled buys, your affiant believes that SKERRITT

distributed narcotics that he likely retrieved from the TARGET LOCATION - 1.  Your affiant

believes that SKERRITT may keep additional narcotics, proceeds, and other evidence of the

TARGET OFFENSE, such as the TARGET PHONES, drug records, packaging and cutting

agents, within the residence as well.

33.     Prior to the first controlled buy referenced above, SKERRITT parked the

TARGET VEHICLE -1 next to CW-1's vehicle, a short distance from his own residence in

Chelsea, and then entered CW-I's vehicle with the fentanyl. Prior to the second controlled buy

referenced above, SKERRITT informed CW-1 that "I'm not going to be long, there is no traffic,

just pulled up, I'm grabbing it." SKERRITT was then observed entering, and a short time later,

subsequently exiting the TARGET LOCATION – 1 before entering TARGET VEHICLE – 2

and driving to CW-I's vehicle with the fentanyl.  Based on the above comment and surveillance,

I believe that SKERRITT retrieved the narcotics from TARGET LOCATION - 1.  Additionally,

investigators believe that evidence of the controlled purchases, including specific items of

clothing, are likely to be found within TARGET LOCATION – 1. Furthermore, SKERRITT said

that he was making another "play," which indicates that SKERRITT sells drugs and therefore, is likely stores drugs for others at that location.

34.     On a prior occasion, law enforcement observed SKERRITT using TARGET LOCATION - 1 for drug distribution.  In January, 2023 [9] under the FBI's direction, an FBI confidential informant ("CI-1") [10] made a controlled buy of narcotics from SKERRITT. On that date, CI-1 communicated with SKERRITT through a series of phone calls and text messages, during which SKERRITT agreed to sell crack cocaine to CI-1.  They agreed to meet at the previous location in Boston, approximately 0.1 miles away from TARGET LOCATION – 1.

35.     Following the series of communications between SKERRITT and CI-1, law enforcement officers followed the same procedures described above with CW-1, except that they did not provide recording devices, provided CI-1 with OAF and instructed CI-1 to meet with SKERRITT and make the drug purchase.  Law enforcement officers subsequently surveilled CI-1 to the pre-arranged meeting location in the vicinity of TARGET LOCATION – 1 in Boston, MA.

36.     While law enforcement officers surveilled CI-1 to the pre-arranged meeting location, additional law enforcement officers were conducting surveillance at the TARGET LOCATION – 1 in Boston, MA and observed SKERRITT arrive at the TARGET LOCATION –

---

[9] I am aware of the date, but I am withholding it for safety concerns, because it may identify the confidential informant.

[10]  CI-1 has a criminal history that includes prior arrests and convictions for shoplifting, assault & battery, motor vehicle violations, larceny, drug possession and assault & battery by means of a dangerous weapon. On previous occasions, CW-1 has accurately identified, and corroborated events and individuals involved in active criminal investigations, including drug and firearm investigations.  CI-1's information has led to previous search warrants, arrests, convictions, and seizures related to drugs and firearms. At the direction of law enforcement, the CI-1 has conducted controlled purchases of evidence in conjunction with criminal investigations.  CI-1's cooperation is financially motivated and CI-1 is being paid for his/her services and information provided.  Based on the corroboration, including physical surveillance, I believe that CI-1's information is reliable.

1 in the TARGET VEHICLE - 1.  SKERRITT used a key to unlock the door and enter that

residence.  A few minutes later, SKERRITT exited the residence and drove the TARGET

VEHICLE - 1 directly to the pre-arranged meeting location at the KFC restaurant located at 695

Columbia Road in Boston, MA, where he met with CI-1.

      37.     Agents, while monitoring the controlled purchase via physical surveillance,

observed the following: SKERRITT entered the front passenger seat of CI-1's vehicle and

engaged in a brief conversation with CI-1, during which SKERRITT and CI-1 conducted an

exchange. After the exchange, SKERRITT walked directly from CI-1's vehicle back to the

TARGET VEHICLE – 1 and left the area.  CI-1 then also left the area.

      38.     After CI-1 left the vicinity of TARGET LOCATION – 1, law enforcement

officers surveilled CI-1 to a predetermined location and retrieved from CI-1 the narotics.  Law

enforcement officers then searched CI-1 and his/her vehicle again, with negative results.  During

the debriefing, CI-1 told agents that CI-1 met with SKERRITT where he/she purchased the

suspected narcotics in exchange for the OAF.

      39.     Likewise, your affiant believes that SKERRITT utilizes the TARGET

VEHICLES for his drug distribution.  Prior to the first controlled buy referenced above,

SKERRITT drove to the controlled buy location, in Chelsea, in the TARGET VEHICLE - 1,

exited the vehicle, and entered CW-I's vehicle to hand CW-1 fentanyl. Prior to the second

controlled buy, SKERRITT drove to the controlled buy location, in Boston, in the TARGET

VEHICLE - 2, exited the vehicle, and entered CW-I's vehicle to hand CW-1 fentanyl.

Investigators believe that evidence of the controlled purchases is likely to be found within the

TARGET VEHICLES.

40.     Although I don't know that SKERRITT lives at the TARGET LOCATION – 1, I believe he has a connection to the location and evidence of the TARGET OFFENSE is likely there because of surveillance observations during this investigation and the fact that this is the residence of a family member. I further believe it is possible that SKERRITT stays at this residence occasionally, based in part on the fact that he has keys to the TARGET LOCATION - 1.

41.     Through my training, experience, debriefings with drug traffickers, and consultation with other special agents and law enforcement officers, I have learned that:

a.     Individuals involved in drug trafficking maintain documents and other records related to their illicit business at their residence and locations associated with them, including stash houses where they store their drugs. Specifically, individuals involved in drug trafficking often maintain ledgers in order to keep track of the purchasing, storage, distribution, and transportation of drugs and/or the laundering of the proceeds of their drug sales. Even after the drugs are sold and/or used, documentary records and ledgers are often maintained for long periods of time to memorialize past transactions and to maintain the names, telephone numbers, and contact information for suppliers, customers, and co-conspirators. In my experience, premises used by drug traffickers (including stash houses) often contain documents and articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

b.     Individuals involved in drug trafficking must often rely on others to obtain their drugs and/or the materials necessary to manufacture/distribute their drugs. Frequently, drug traffickers maintain evidence of the identities of these co-conspirators at premises associated with them and will maintain these types of materials even after drugs are sold or used.

c.     Individuals involved in drug trafficking often store controlled substances in their homes or other residences to which they have access.

d.     Individuals involved in drug trafficking often store articles or personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

e.     Individuals involved in drug trafficking frequently maintain books, records, receipts, notes, ledgers, money orders, emails, and other documents relating to the ordering, sale, and distribution of controlled substances and monetary instruments

and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances. Such documents may be maintained in paper or electronic form and are generally maintained where the narcotics traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other locations where they regularly conduct their drug business. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substance from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business;

f.      Individuals involved in drug trafficking commonly conceal records of drug transactions in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

g.      Individuals involved in drug trafficking commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances. Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cell phone(s). They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

h.      Individuals involved in drug trafficking commonly have photographs of themselves, their associates, their property, and their products in their possession or in their residences, and frequently maintain these photographs on their cell phone(s) and other electronic devices;

i.      Individuals involved in drug trafficking frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or key locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residence;

j.      Individuals involved in drug trafficking frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above.

15

k.      Individuals involved in drug trafficking keep weapons, including firearms, at the locations where they store their drug supplies in order to protect both themselves and their drugs from thefts and/or robberies.

l.      Individuals involved in drug trafficking use various tools, instruments, materials, and other paraphernalia to facilitate their trafficking, including weighing the drugs and packaging the drugs. These types of materials include, but are not limited to: scales, cutting materials, and packaging materials. These types of materials are often maintained at locations associated with drug traffickers even after drugs are sold or used. I am also aware that it is generally a common practice for traffickers to conceal large sums of money at their residences, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers may use wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences, even after drugs are sold or used.

42.      Based upon my training and experience, I also know that individuals typically possess in their residence documents and other items that reflect their occupancy and control of the premises, such as but not limited to personal mail, checkbooks, identification, notes, correspondence, leases, utility bills, rent receipts, financial documents, house keys, mail keys, storage keys, and photographs.

## IV.      PROBABLE CAUSE THAT THE TARGET PHONES CONTAIN EVIDENCE, FRUITS AND INSTRUMENTALITIES OF THE TARGET OFFENSE

43.      In my training and experience, individuals involved in the illegal distribution of controlled substances will regularly use cellular phones to either contact sources of supply through phone calls, texts or emails to coordinate the acquisition of controlled substances or to contact buyers of controlled substances to arrange for the sales.  This request to seize and search includes "smartphones," i.e., those cell phones that are capable of serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.

44.     Moreover, SKERRITT used each of the TARGET PHONES to participate in and facilitate the TARGET OFFENSE. Prior to each of the controlled buys, SKERRITT used the TARGET PHONES to set up the controlled buys and to negotiate the purchase for fentanyl. Based on my experience and training, I know that records relating to these communications, including text messages, are likely stored on these phones.  In addition, the fact that SKERRITT may possess these phones tends to prove that SKERRITT violated the TARGET OFFENSE.

45.     Moreover, based on my training and experience, I know that dealers and others involved in the drug trade frequently utilize multiple mobile phones in connection with their illegal drug activity.   For example, individuals involved in drug trafficking frequently utilize one phone to communicate with drug customers and another phone to communicate with other drug-related associates (*e.g.*, suppliers, runners, organizers).  Individuals such as SKERRITT involved in drug trafficking frequently change their phones and/or phone numbers, and their utilization of multiple phones can mitigate the disruption associated with these changes (for example, a dealer can change the phone used to communicate with drug suppliers or organizers while not changing the phone used to communicate with customers, or vice versa).  Here, during the time frame of the controlled buys referenced above, SKERRITT utilized the telephone number 774-464-1682, or the TARGET PHONE - 1, the telephone number 857-383-8962, or TARGET PHONE – 2 and the telephone number 857-588-3057, or the TARGET PHONE – 3.

46.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files stored on cellular phones (and particularly smartphones) can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

    a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their cell phones, they

can easily transfer the data from their old cell phone to their new phone.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a smartphone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

47.      Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in a cell phones, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that the cell phone be seized and processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because:

a.      Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.      Technical requirements for analyzing cell phones is a highly technical process requiring expertise and a properly controlled environment.  It is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.  This application seeks permission to search and seize cell phones either onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

48.      Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

18

## BIOMETRIC FEATURES

49.      I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

50.      On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours <u>and</u> the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

51.      The passcodes that would unlock the TARGET PHONES are not currently known to law enforcement.  Thus, it may be useful to press the finger(s) of the user(s) of the TARGET PHONES to the devices' fingerprint sensors or to hold the devices up to the faces of the owners in an attempt to unlock the devices for the purpose of executing the search authorized by these

warrants.  The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by these warrants.

52.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.

53.     For these reasons, I request that the Court authorize that, if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to the applied-for warrants and may be unlocked using one of the aforementioned biometric features, law enforcement personnel may obtain from the device owners the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to press the fingers (including thumbs) of the device owner to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the devices in order to search the contents as authorized by these warrants.

**CONCLUSION**

54.     Based on the information describe above, your affiant has probable cause to believe that SKERRITT, and others, have committed, are committing, and will continue to commit the TARGET OFFENSE, distribution of a controlled substance, in violation of 21 U.S.C. § 841(a).

55.     Your affiant further submits that probable cause exists to believe that cellular phones possessed and/or used by SKERRITT, including the TARGET PHONES, contain fruits, evidence, and instrumentalities of the TARGET OFFENSE.

56.     Your affiant further submits that there is probable cause to believe that property that constitutes evidence of the commission of controlled substances offenses under 21 U.S.C. § 841(a), and property designed or intended for use or which is or has been used as a means of committing criminal offenses, will be found at the TARGET LOCATION and in the TARGET VEHICLES, described further in Attachment B.

57.     Accordingly, I respectfully request that the Court issue search warrants

authorizing investigations to search:

a.      662 Columbia Road, Boston, MA 02125 (the "TARGET LOCATION - 1");

b.      A 2019 black Infiniti SUV with Massachusetts registration 3EKA91, registered to, and driven by, SKERRITT (the "TARGET VEHICLE - 1");

c.      A gray Nissan Altima with California registration 9BZH119, registered to UMI ASSET LLC, and driven by SKERRITT (the "TARGET VEHICLE - 2");

d.      The person of Csean SKERRITT;

e.      The cellular phone assigned telephone number 774-464-1682 ("TARGET PHONE - 1");

f.      The cellular phone assigned telephone number 857-383-8962 ("TARGET PHONE – 2"); and

g.      The cellular phone assigned telephone number 857-588-3057 ("TARGET PHONE - 3").

Sworn to under the pains and penalties of perjury,

Jason Taylor
Special Agent, FBI

The affiant appeared before me on this date, by telephonic conference or other reliable electronic means, pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Subscribed and sworn to on
this _3_ day of February, 2023.

HON. JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

## ATTACHMENT A-1

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

The premise to be searched is 662 Columbia Road, Boston, MA 02125 (the "TARGET LOCATION - 1"). The TARGET LOCATION - 1 is a single-family townhouse style brick building with a cream-colored door and the number "662" on the left side of the door.



The premises to be searched shall include all of the TARGET LOCATION where SKERRITT has a right of access, including containers such as safes, vaults, file cabinets, drawers, backpacks, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, and trash cans, located in or around the TARGET LOCATION, that are owned or under the control of SKERRITT.

## <u>ATTACHMENT A-2</u>

## DESCRIPTION OF THE VEHICLE TO BE SEARCHED

The vehicle to be searched is a 2019 black Infiniti SUV with Massachusetts registration 3EKA91, registered to, and driven, by SKERRITT (the "TARGET VEHICLE - 1").

 

## ATTACHMENT A-3

## DESCRIPTION OF THE VEHICLE TO BE SEARCHED

The vehicle to be searched is a gray Nissan Altima with California registration 9BZH119, registered to UMI ASSET LLC, and driven by SKERRITT (the "TARGET VEHICLE - 2").

 

**ATTACHMENT A-4**

**DESCRIPTION OF THE PERSON TO BE SEARCHED**



Name: Csean SKERRITT
DOB: xx/xx/1988
Addresses: 21 Beacon Street, Chelsea, MA 02150 and 662 Columbia Road, Boston, MA 02125

**<u>ATTACHMENT A-5</u>**

**DESCRIPTION OF THE PHONE(S) TO BE SEARCHED**

The cellular phone used by: Csean SKERRITT, assigned telephone number 774-464-1682 ("TARGET PHONE - 1").

## <u>ATTACHMENT A-6</u>

**DESCRIPTION OF THE PHONE(S) TO BE SEARCHED**

The cellular phone used by: Csean SKERRITT, assigned telephone number 857-383-8962 ("TARGET PHONE – 2").

## <u>ATTACHMENT A-7</u>

## **DESCRIPTION OF THE PHONE(S) TO BE SEARCHED**

The cellular phone used by: Csean SKERRITT, assigned telephone number 857-588-3057 ("TARGET PHONE - 3").

## ATTACHMENT B

## ITEMS TO BE SEIZED

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a) (distribution of a controlled substance) (the "TARGET OFFENSE"), for the period of January 1, 2022 through the present day, including:

A.   Controlled substances;

B.   Documents, objects and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the TARGET LOCATION or TARGET VEHICLES, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephones, and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, and personal identification documents;

C.   Cash, currency, and records relating to proceeds derived from the sale of controlled substances and expenditures of money and wealth, to-wit: money orders, wire transfers, cashier's checks and receipts, keys and records relating to safe deposit boxes or storage units, bank accounts and statements, passbooks, checkbooks, and check registers, as well as precious metals and gems such as gold, silver, diamonds, etc. that either (a) display SKERRITT's name, nickname or alias; (b) are identified by SKERRITT as belonging to him; or (c) located and seized within an area of the residence determined to be used or occupied by SKERRITT;

D.   Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, for example: sealable plastic bags, manila envelopes, sandwich bags, heat sealers, and Ziploc bags;

E.   Records and tangible objects pertaining to drug trafficking;

F.   Records and tangible objects pertaining to the payment, receipt, transfer, or storage of money or other things of value by SKERRITT, including, without limitation:

1.   Bank, credit union, investment, money transfer, and other financial accounts;
2.   Credit and debit card accounts;
3.   Tax statements and returns;
4.   Business or personal expenses;
5.   Income, whether from wages or investments;

30

6.  Loans;

G.  Records and intangible objects pertaining to the existence, identity, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

H.  Identifying articles of clothing, including but not limited to, a black facemask, a winter jacket with a fur-lined hood, a light-colored hooded sweatshirt, distressed (cut-up) jeans, a black leather jacket, black jeans, and white athletic shoes.

I.  Any trace evidence and forensic evidence, specifically but not limited to, latent prints or other evidence that could contain DNA of the occupants; and

J.  All computer hardware, computer software, and storage media belonging to or used by SKERRITT, including the cellular phones assigned phone numbers 774-464-1682, 857-383-8962 and 857-588-3057.

For any computer hardware, computer software, mobile phones, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment):

A.  All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of the TARGET OFFENSE;

B.  Evidence of who used, owned, or controlled the computer equipment;

C.  Evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

D.  Evidence of the attachment of other computer hardware or storage media;

E.  Evidence of counter-forensic programs and associated data that are designed to eliminate data;

F.  Evidence of when the computer equipment was used;

G.  Passwords, encryption keys, and other access devices that may be necessary to access the computer equipment; and

H.  Records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage.

During the execution of the search of SKERRITT, the TARGET PHONES, the TARGET LOCATION or the TARGET VEHICLES, described in Attachments A-1 to A-7, law

31

enforcement personnel are authorized to press the fingers (including thumbs) of SKERRITT to the sensor of the subject device and/or to hold the device in front of SKERRITT's face.

## DEFINITIONS

For the purpose of this warrant:

- "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.
- "Computer hardware" means any electronic device capable of data processing (such as a computer ,smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).
- "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.
- "Storage media" means any media capable or collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).
- "Data" means all information stored on storage media of any form in any storage format and for any purpose.
- "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below. If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.